UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ASTOR CHOCOLATE CORP.,

                                        Plaintiff,

                    -v-

ELITE GOLD LTD., PT MAYORA INDAH
TBK, MAYORA GROUP, MAYORA CO.,
FOOD DEPOT CORPORATION, ORANGE
GROCER, FOOD INDUSTRIES, and TAKARI
INTERNATIONAL, INC.,

                                        Defendants.

---

18 Civ. 11913 (PAE)

OPINION &
ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Astor Chocolate Corp. ("Astor") brings this action against eight defendants:

Elite Gold Ltd. ("Elite Gold"); PT Mayora Indah TBK ("Mayora Indah"), Mayora Group, and

Mayora Co. (collectively, the "Mayora Parties"); Food Depot Corp., Orange Grocer, and Food

Industries (collectively, the "Food Depot Parties"); and Takari International, Inc. ("Takari").

Astor alleges trademark infringement, unfair competition, deceptive business practices, false

advertising, and injury to business reputation.

Those claims arise from Elite Gold's ownership of the registered trademark "Astor" in

connection with products similar to Astor's products; the Mayora Parties' manufacture and sale

of similar products bearing the "Astor" mark, licensed from Elite Gold; Takari's purchase and

distribution of those products to retailers within the United States; and the Food Depot Parties'

offering and sale of such products in online commerce in the United States.

In May, the Court stayed defendants' motions to dismiss for lack of personal jurisdiction

under Federal Rule of Civil Procedure 12(b)(2), and the Mayora Parties' motion to dismiss for

improper service of process pursuant to Federal Rule of Civil Procedure 12(b)(5), while authorizing limited jurisdictional discovery to enable the Court to resolve those motions. *See* Dkt. 78, published at *Astor Chocolate Corp. v. Elite Gold Ltd.* ("*Astor I*"), No. 18 Civ. 11913 (PAE), 2020 WL 2130680, at *13 (S.D.N.Y. May 5, 2020).

Jurisdictional discovery is complete. The Court now considers, in light of that discovery, the defendants' original motions to dismiss and the parties' supplemental briefs. For the reasons that follow, the Court grants the motions filed by the Mayora Parties and Elite Gold, but denies the motion filed by the Food Depot Parties.

## I.      Background

### A.      Factual Background[1]

The Court incorporates by reference the factual background set out in its May 5, 2020

Opinion and Order.  *See Astor I*, 2020 WL 2130680, at *2–4.  The Court provides background

here only as needed to resolve the pending motions to dismiss.

---

[1] The Court's account of the factual allegations is drawn from the Second Amended Complaint, Dkt. 79 ("SAC"), and various declarations and exhibits submitted by the parties, as described more fully *infra*.  On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside the pleadings, including accompanying affidavits, declarations, and other written materials.  *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)).  The Court has thus considered the declaration of Bruce Ainbinder, Esq., in support of Elite Gold's motion, Dkt. 47 ("Ainbinder Decl."), and the attached exhibits; the declaration of Douglas F. Hartman, Esq., in support of Elite Gold's motion, Dkt. 48 ("First Hartman Decl."), and the attached exhibits; the sworn affidavits attached to Elite Gold's reply memorandum of law, Dkt. 60 ("Elite Gold Reply"); the declaration of Mr. Hartman in support of the Mayora Parties' motion, Dkt. 63 ("Second Hartman Decl."), and the attached exhibits; the declaration of Mr. Hartman in support of the Food Depot Parties' motion, Dkt. 66 ("Third Hartman Decl."), and the attached exhibits; and the affidavit of J. Mark Lane, Esq., in opposition to the Mayora Parties' and the Food Depot Parties' motions, Dkt. 71 ("Lane Aff."), and the attached exhibits.

After jurisdictional discovery, the plaintiff must make a "factually supported" *prima facie* showing of personal jurisdiction that includes "an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  "[T]o the extent they are uncontroverted by the defendant's affidavits," *MacDermid*, 702 F.3d at 727 (citation omitted), the Court "credits all [p]laintiffs' factual averments as true, resolving any doubts in [p]laintiffs' favor," *Kiobel v. Royal Dutch Petrol. Co.*, No. 02 Civ. 7618 (KMW), 2010 WL 2507025, at *8 (S.D.N.Y. June 21, 2010) (citing *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993)).  Thus, the Court also considers the declarations of Eric Shalyutin, Esq., in further opposition to defendants' motion to dismiss, *see* Dkts. 84 ("First Shalyutin Decl."), 85 ("Second Shalyutin Decl."), 86 ("Third Shalyutin Decl."), and the attached exhibits; and Mr. Hartman's affidavit submitted in support of the defendants' motions, Dkt. 87-1 ("Hartman Aff."), and the attached exhibits.

1.      **Parties**

Astor is a New York corporation with its principal place of business in New Jersey.  SAC
¶ 6.  Astor manufactures, wholesales, and retails chocolates and other confectionary products.
*Id.* ¶ 1.  It has continuously used its unregistered trademarks—including "Astor Chocolate" and
"Astor"—in connection with those products since as early as July 19, 1950.  *Id.*

Elite Gold is an intellectual-property holding company incorporated in the British Virgin
Islands with its principal place of business in the British Virgin Islands.  *See* Ainbinder Decl.,
Ex. C ("Tjay Decl.") ¶¶ 3, 8; *see also* SAC ¶ 7.  Elite Gold has owned the mark "ASTOR," U.S.
Trademark Reg. No. 4,938,707 (the "Elite Gold Mark"), since April 12, 2016, with a stated date
of first use of January 1, 2012.  SAC ¶ 32; *see also* Tjay Decl. ¶¶ 9–10.  The Elite Gold Mark is
registered in International Class 30 for several foodstuffs, including chocolate and a variety of
chocolate products.  SAC ¶ 33.  Elite Gold does not directly manufacture, sell, or otherwise
distribute goods or services in connection with the Elite Gold Mark.  Tjay Decl. ¶ 11.

Mayora Indah is an Indonesian corporation with a principal place of business in Jakarta,
Indonesia.  *See* Second Hartman Decl., Ex. D ("Lauwrus Decl.") ¶ 3; *see also* SAC ¶ 8.  Mayora
Indah and Elite Gold are separate companies.  First Hartman Decl., Ex. G ("Second Tjay Decl.")
¶¶ 3–4.  But discovery has revealed that Elite Gold's only two directors, Oey Him Tjay and
Wardhana Atmadia, *see* First Shalyutin Decl., Ex. C at 171, are also directors or commissioners
of Mayora entities, *see id.* at 27 (Atmadia is Mayora Indah's director of operations); SAC ¶ 53
(Tjay is a commissioner of a Mayora-owned entity); Second Shalyutin Decl., Ex. E-1 at ECF p. 6
(Mayora's confirmation of same in response to interrogatory).  Mayora Indah licenses the Elite
Gold Mark from Elite Gold for $1, *see* First Shalyutin Decl., Ex. C, Ex. 4 ("License Agreement"),
and manufactures and sells products branded with the Elite Gold Mark to distributors outside the
United States, Lauwrus Decl. ¶¶ 4–5.

4

Mayora Group is a trade name for Mayora Indah and not a legal entity.  Lauwrus Decl. ¶ 10; *see also* SAC ¶ 9.  Yet Elite Gold listed "Mayora Group" as its "Licensee and Manufacturer" in its Initial Disclosure to the U.S. Patent and Trademark Office ("USPTO"). Lane Aff., Ex. B ("Initial Disclosures") at 2.  There is no legal entity named Mayora Co.  *See* Lauwrus Decl. ¶ 11.

Takari is a Canadian corporation that imports products bearing the Elite Gold Mark into the United States.  SAC ¶ 14.

All three Food Depot Parties are Oklahoma corporations.  Third Hartman Decl., Ex. B ("Widianto Decl.") ¶ 3.  Each does business out of California.  *Id.*; *see also* SAC ¶ 13.  The Food Depot Parties sell products on online marketplaces, such as Amazon.com and eFoodDepot.com. SAC ¶¶ 20–21, 69, 86.

Food Depot Corporation is the corporate name of the entity operating eFoodDepot.com. *Id.* ¶ 13.  It is located at the same address from which goods are shipped when ordered from Orange Grocer and Food Industries online.  *Id.*  Orange Grocer and Food Industries offer and sell, under the name "Astor" on Amazon.com, products identical to the specimen used by Elite Gold in its PTO application.  *Id.* ¶¶ 11–12.  The SAC alleges that the Mayora Parties also sell similar products on those websites, but the Mayora Parties deny this, and there is no evidence in the record of sales by Mayora into New York or elsewhere.  *See id.*; Lauwrus Decl. ¶ 5.

The Food Depot Parties purchase "Astor"-branded products from Takari in California, and from no other person or entity.  Widianto Decl. ¶¶ 4, 7; *see* SAC ¶ 14.  They do not have any agreements, contracts, or relationship with Elite Gold or the Mayora Parties apart from through Takari.  *See* First Shalyutin Decl., Ex. F ("Mayora Interrogatories") at 3.

### 2.    The ASTOR Trademark

Although Astor has continually used its "Astor" trademark in connection with its products since July 19, 1950, SAC ¶ 1, it first sought to register the "Astor Chocolate" mark with the USPTO on December 13, 2017, *id.* ¶ 31.  But on April 23, 2016, the USPTO had granted to Elite Gold the registration of the Elite Gold Mark.  *Id.* ¶ 32.  Elite Gold's application for that mark had included a specimen, which bore the Elite Gold Mark and the name "Mayora."  SAC ¶ 47; *see* Lane Aff., Ex. F ("Elite Gold Mark Application") at 8.

Accordingly, on February 23, 2018, the USPTO denied Astor's application, in part because of the Elite Gold Mark's prior registration.  SAC ¶¶ 32–33.  In response, on June 3, 2018, Astor petitioned the USPTO to cancel the Elite Gold Mark's registration based on Astor's prior use.  *Id.* ¶ 36.  In Elite Gold's initial disclosures filed in connection with the proceedings on that petition, it disclosed that "Mayora Group," with U.S. offices in San Diego, California, was "Licensee and Manufacturer for Elite Gold."  *Id.* ¶ 38; *see also* Initial Disclosures at 2.  The USPTO has stayed those proceedings pending the outcome of this litigation.  SAC ¶ 40.

### 3.    Defendants' Products

Astor alleges that products identical to the specimen submitted by Elite Gold in its USPTO application are being sold in online commerce through Amazon.com and eFoodDepot by sellers named "Mayora," "Orange Grocer," and "Food Industries," in violation of its own trademark in the "Astor" brand.  *Id.* ¶¶ 48–51.

Astor alleges that these products are offered to and sold in New York.  *Id.* ¶ 52.  Discovery has revealed that the allegedly infringing products appear to reach New York through the following chain.  First, Elite Gold has licensed the Elite Gold Mark to Mayora Indah for $1.  *See* License Agreement.  Second, in Indonesia, Mayora Indah manufacturers and packages the confections with the allegedly infringing mark.  *See* Mayora Interrogatories at 8.  Third, Mayora

6

Indah sells those products to Takari, a Canadian distributor, for distribution into the United States. *Id.*; Third Shalyutin Decl., Ex. K ("Gunawan Tr.") at 22. Takari appears to be Mayora Indah's sole distributor into the United States. *See* Gunawan Tr. at 37. But there is no agreement in place between Mayora Indah and Takari as to where Takari will ultimately sell those products, or any formal agreement at all between the two beyond their individual sales contracts. *See id.* at 30; Mayora Interrogatories at 8. And Mayora Indah does not receive information from Takari about to whom or where Takari then re-sells Mayora Indah products. *See* Gunawan Tr. at 29–30. Takari then sells the products to retailers within the United States, including the Food Depot Parties. *See* Widianto Decl. ¶¶ 4, 7; *see also* SAC ¶ 14. Finally, those retailers, including the Food Depot Parties, sell the products into various states within the United States, including New York. *See* First Shalyutin Decl., Ex. A, Ex. 1 ("New York Sales Records").

On December 6, 2018, and September 7, 2019, Astor's counsel placed an order for "Astor Chocolate Wafer Stick," offered by Orange Grocer and Food Industries, respectively, from Amazon.com, to be delivered to an address in New York State. *Id.* ¶¶ 55–61. Each product arrived in New York State a few days later. *Id.* ¶¶ 56, 61. The first bore both the "Astor" mark and the name "Mayora." *Id.* ¶ 56. It was mailed from California by Richi Widianto, president at Food Depot, Food Industries, and Orange Grocer. *Id.* ¶ 58; *see* Widianto Decl. ¶ 2. The second bore the same mark and "Mayora" name, and showed a return address belonging to Food Depot. SAC ¶¶ 60–61. In jurisdictional discovery, the Food Depot Parties have produced records showing several other sales into New York State, involving buyers unrelated to Astor or its counsel. *See* New York Sales Records.

### B.    Procedural History

On September 23, 2019, Astor filed an Amended Complaint.  On October 15, 2019, Elite Gold moved to dismiss for lack of personal jurisdiction, Dkt. 45, along with a memorandum of law, Dkt. 46 ("Elite Gold Mem."), and declarations in support, which attached, among other exhibits, a supplemental declaration of Oey Him Tjay, *see* Second Tjay Decl.  On November 6, 2019, Astor opposed that motion.  Dkt. 54 ("First Pl. Mem.").  On November 20, 2019, Elite Gold filed a reply attaching three more affidavits.  *See* Elite Gold Reply.

On November 26, 2019, Mayora Indah moved to dismiss for lack of personal jurisdiction, for misnomer of parties, and for improper service of process.  Dkt. 61.  It also filed a memorandum of law in support, Dkt. 62 ("Mayora Mem."), and additional declarations, which in turn attached, among other exhibits, another declaration from Mr. Tjay, Second Hartman Decl., Ex. C ("Third Tjay Decl."), and the declaration of Yuki Teng, *id.*, Ex. E ("Teng Decl.").  Mayora Indah represented that Mayora Group and Mayora Co. are not legal entities and therefore should be dismissed or stricken.  Mayora Mem. at 2, 4.

Also on November 26, 2019, the Food Depot Parties filed their own motion to dismiss for lack of personal jurisdiction, Dkt. 64, with an accompanying memorandum of law, Dkt. 65 ("Food Depot Mem."), and another declaration by Mr. Hartman, Third Hartman Decl.

On January 10, 2020, Astor filed a memorandum of law in opposition to the motions to dismiss filed by the Mayora Parties and the Food Depot Parties, Dkt. 72 ("Second Pl. Mem."), along with the Lane Affidavit and attached exhibits, Lane Aff.

On February 7, 2020, the Mayora Parties and the Food Depot parties filed a consolidated reply.  Dkt. 77 ("Mayora & Food Depot Reply").

On May 5, 2020, the Court issued an opinion and order addressing the pending motions. *Astor I*, 2020 WL 2130680, at *13.  There, the Court found it appropriate to defer ruling on the

defendants' motions until after plaintiffs had taken limited jurisdictional discovery on discrete factual issues presented by the parties' arguments. *Id.* As to the Food Depot Parties, the Court recognized that sales into New York like those alleged by Astor would, in some cases, support personal jurisdiction over those parties under New York's long-arm statute. *Id.* at *9. But because those orders had been placed by Astor's counsel, and Astor had not identified other instances of similar sales into the state, the Court found that personal jurisdiction was improper on the then-present record. *Id.* Nevertheless, given the Food Depot Parties' "deafening[] silen[ce]" as to whether they had, in fact, sold other Astor-branded products into New York, the Court found jurisdictional discovery "particularly appropriate" as to such other sales, and authorized Astor to pursue such discovery. *Id.*

As to the Mayora Parties, the Court identified two issues warranting jurisdictional discovery. First, they had challenged Astor's service of process on them, which Astor claimed to have effected by serving Yuki Teng, a person that Elite Gold had represented, in its Initial Disclosures to the USPTO, as the country manager in the United States for the "Mayora Group." *Id.* at *11. Astor also alleged that Teng had a Mayora email address and had represented on his LinkedIn page that he was "Marketing Manager USA" for Mayora Indah. *Id.* The Mayora Parties, however, denied that Teng was authorized to accept service on their behalf, or that Mayora Indah employed him. *Id.* Second, the Mayora Parties challenged the Court's personal jurisdiction over them, arguing that they do not sell products in the United States. *Id.* However, Astor cited conflicting evidence, including that Mayora Indah elsewhere advertised that it sells products in the United States and that the allegedly infringing products described above bore a "Mayora" mark. *Id.* Accordingly, the Court authorized Astor to take jurisdictional discovery on five discrete topics, and to take a single Rule 30(b)(6) deposition of the Mayora Parties on the

same issues.[2]  To expedite proceedings in case Teng was not, in fact, authorized to accept service

on behalf of the Mayora Parties, the Court also directed Astor to begin the process of effecting

foreign service on Mayora Indah.

      As to Elite Gold, it argued that it had not licensed the Elite Gold Mark to any individual

or entity with any connections to New York, and that it did not sell any products, in any capacity,

anywhere in the world.  *Id.* at *10.  Rather, it argued that it solely licensed its own mark to

Mayora Indah, which then manufactures and sells products branded with the Elite Gold Mark.

*Id.*  Accordingly, it maintained that it was not subject to personal jurisdiction in New York.

Those arguments, however, left open "the possibility . . . that Elite Gold otherwise purposefully

derives some financial or business benefit from the sale to customers of Astor-branded products

in New York or the United States."  *Id.*  They also failed to address Elite Gold's registration with

the PTO, which certified that it was using the Elite Gold Mark in interstate commerce and listed

the Mayora Group, with "Country Manager" offices in San Diego, California, as the first party

with relevant knowledge of such activities.  *Id.*  Although the Court noted that "these

unanswered allegations likely do not on their own provide a basis for the exercise of personal

---

[2] Specifically, the Court authorized Astor to take discovery on:

> (i) Yuki Teng, including his connections to, and U.S. contacts on behalf of, any
> Mayora entity, any other defendant, and Takari, and whether service on the Mayora
> Parties through Teng was proper; (ii) the factual basis for the Mayora Parties'
> statements that they distribute products to the United States, and that
> "yuki.tenggara@mayora.co.id" is the email for Mayora's U.S. contact; (iii) why
> Yuki Teng lists himself as a U.S. country manager for Mayora and why Elite Gold
> referred to Mayora's U.S. operations in its PTO disclosures; (iv) the Mayora
> Parties' corporate, contractual, or other connections to each the other defendants
> and Takari; and (v) the Mayora Parties contacts with California, or any other U.S.
> state, in connection with Astor's claims.

*Astor I*, 2020 WL 2130680, at *12.

jurisdiction over Elite Gold," they did raise issues of jurisdictional fact justifying limited jurisdictional discovery. *Id.* Accordingly, the Court authorized Astor to take jurisdictional discovery on four discrete topics.[3]

After the completion of jurisdictional discovery, the Court directed Astor to submit supplemental briefing explaining "what the new discovery shows as to personal jurisdiction for each defendant." *Id.* at *13. It also authorized defendants to respond.[4]

On June 2, 2020, Astor filed its supplemental memorandum of law. *See* Dkt. 83 ("Pl. Supp. Mem."). It also submitted the First, Second, and Third Declarations of Mr. Shalyutin, which attached, *inter alia*, the relevant documents that Astor obtained through jurisdictional discovery. On June 9, 2020, the defendants filed a consolidated response, Dkt. 87 ("Def. Supp. Mem."), which attached the Fourth Hartman Declaration and accompanying exhibits.

On July 15, 2020, Astor filed proof of service as to Mayora Indah and Takari. *See* Dkts. 91–92.

---

[3] Those topics were:

> i) whether and to what extent Elite Gold has granted licenses to any other entity for the sale, directly or indirectly, of products bearing the Elite Gold Mark into New York and/or the United States; (ii) the relationship between Elite Gold and the Mayora Parties, or any corporate affiliate of the Mayora Parties, including any license agreements for the Elite Gold Mark and any overlapping management or directors; (iii) the relationship, if any, between Elite Gold and Takari; and (iv) the basis for Elite Gold's representations to the PTO that it was using the "Astor" mark in interstate commerce and that a "Mayora Group" with a "Country Manager" in California had relevant knowledge of Elite Gold's activities.

*Id.* at *10.

[4] The Court also granted Astor leave to file a second amended complaint, but solely to add Takari as a party. *See id.* at *12 (limiting amendment to changes "necessary to properly allege one or more of the already pled causes of action against Takari"). Astor filed the SAC, adding Takari, on May 19, 2020. On June 19, 2020, Takari filed an answer. Dkt. 89.

II.     **Applicable Legal Standards**

A.     **Legal Principles Governing Motions to Dismiss Under Rule 12(b)(2)**

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball*, 902 F.2d at 197).

Before jurisdictional discovery, a plaintiff's *prima facie* showing of jurisdiction "may be established solely by allegations." *Ball*, 902 F.2d at 197. However, where jurisdictional discovery has been conducted—as here—a plaintiff's *prima facie* showing must be "factually supported"; in other words, it must "include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co.*, 84 F.3d at 567 (alteration in original) (quoting *Ball*, 902 F.2d at 197); *see Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 502 (S.D.N.Y. 2004).

In assessing the plaintiff's showing, the court applies a "standard . . . akin to that on a motion for summary judgment," construing the "pleadings documents, and other evidentiary materials . . . in the light most favorable to the plaintiff and all doubts are resolved in its favor." *Melnick*, 346 F. Supp. 2d at 503 (citing *Kamen v. AT&T Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986)); *see Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, No. 05 Civ. 10773 (RMB), 2007 WL 1489806, at *2 (S.D.N.Y. May 21, 2007). "At the same time, particularly given the amount of time provided for jurisdictional discovery, the Court will limit its

jurisdictional analysis to the facts presented and must assume that the [p]laintiffs have provided all the evidence they possess to support their jurisdictional claims." *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001).

Although Rule 12(b)(2) motions cannot be converted into a Rule 56 motion for summary judgment when extrinsic evidence is considered, the Rule 56 standard nevertheless guides the Court as to the documents it may consider outside the pleadings. *See Big Apple Pyrotechnics & Multimedia Inc. v. Sparktacular Inc.*, No. 05 Civ. 9994 (KMW), 2007 WL 747807, at *1 (S.D.N.Y. Mar. 9, 2007) (citing *Kamen*, 791 F.2d at 1011). Under that rule, a court, in resolving a Rule 12(b)(2) motion made after jurisdictional discovery, may consider only *admissible* evidence.[5] *Cf. Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (motion for summary judgment). Accordingly, affidavits or declarations in support of personal jurisdiction "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B.    Legal Principles Governing Personal Jurisdiction

For a federal court to lawfully exercise personal jurisdiction, three primary requirements must be met.

---

[5] Courts commonly decline to rely on non-admissible evidence in the context of Rule 12(b)(2) motions made after jurisdictional discovery. *See, e.g.*, *DeLorenzo v. Ricketts & Assocs.*, No. 15 Civ. 2506 (VSB), 2017 WL 4277177, at *7 n.13 (S.D.N.Y. Sept. 25, 2017) (declining to rely on inadmissible hearsay evidence in resolving Rule 12(b)(2) motion), *aff'd sub nom. DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018) (summary order); *Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*, No. 10 Civ. 1777 (ADS), 2011 WL 381612, at *5 (E.D.N.Y. Feb. 2, 2011) (same for inadmissible statement in, and attachment to, memorandum of law); *Moneygram*, 2007 WL 1489806, at *3 n.5 (noting that defendant had not presented any admissible jurisdictional evidence, aside from his deposition testimony, and that the court had excluded an affidavit because it was not based on personal knowledge).

"First, the plaintiff's service of process upon the defendant must have been procedurally proper." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012).

Second, "there must be a statutory basis for personal jurisdiction that renders such service of process effective." *Id.* Here, Astor asserts that specific personal jurisdiction[6] is proper as to all defendants under New York's long-arm statute, and, in the alternative, that specific personal jurisdiction is proper as to Elite Gold and the Mayora Parties under Rule 4(k)(2).[7] *See, e.g.*, *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (federal court generally determines whether it has personal jurisdiction over a defendant based on the long-arm statute of the state in which it sits). Thus, the relevant statutory inquiry here is whether the Court may exercise specific personal jurisdiction over each defendant under New York law, *see* New York Civil Practice Law and Rules ("CPLR") § 302, or, if not, whether the Court may exercise specific personal jurisdiction over Elite Gold or the Mayora Parties under Federal Rule of Civil Procedure Rule 4(k)(2).

Third, if there is a statutory basis for jurisdiction, the Court then asks whether "an exercise of jurisdiction under these laws is consistent with federal due process requirements."

---

[6] Personal jurisdiction may be general or specific. General personal jurisdiction subjects a defendant to suit on all claims. *Cortlandt St. Recovery Corp. v. Deutsche Bank AG*, No. 14 Civ.1568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A court may assert general jurisdiction over a corporation where its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear*, 546 U.S. at 919). Specific personal jurisdiction subjects a defendant to suit on only claims that arise from the defendant's conduct in the forum. *Cortlandt St. Recovery Corp.*, 2015 WL 5091170, at *2; *see also Daimler*, 571 U.S. at 126–27. As to each defendant, Astor asserts only specific personal jurisdiction.

[7] Rule 4(k)(2) cannot provide a basis for jurisdiction over the Food Depot Parties, because each is subject to general jurisdiction at least in Oklahoma.

*Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005).  *See generally Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).

### 1.      Service of Process

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."  *Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (citation omitted).  When "a defendant challenges service of process, the burden of proof is on the plaintiff to show the adequacy of service." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010) (citations and internal quotation marks omitted).  Courts analyze the sufficiency of service of process by looking to Rule 4, which "governs the content, issuance, and service of a summons."  *Id.* (citing Fed. R. Civ. P. 4).

Under Rule 4(h), unless federal law provides otherwise or the defendant's waiver has been filed, a domestic or foreign corporation must be served in one of two ways.  The corporation may be served:

> in a judicial district of the United States . . . in the manner prescribed by Rule 4(e)(1) for serving an individual; or . . . by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant.

Fed. R. Civ. P. 4(h)(1).  Alternatively, the corporation may be served "at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  Fed. R. Civ. P. 4(h)(2).

As to the timing of service, Rule 4(m) sets forth a general rule that "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time," unless the plaintiff can show good cause for the failure.

Fed. R. Civ. P. 4(m).  But Rule 4(m) also provides that "[t]his subdivision (m) does not apply to service in a foreign country under Rule 4(f), 4(h)(2), or 4(j)(1)." *Id.*  "Although Rule 4(m) creates an exception for service in a foreign country pursuant to subdivision (f) . . . this exception does not apply if . . . the plaintiff did not attempt to serve the defendant [that resides] in the foreign country." *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 133–34 (2d Cir. 2005) (citation omitted); *accord DEF v. ABC*, 366 F. App'x 250, 253 (2d Cir. 2010) (summary order) ("[T]he foreign country exception to . . . 4(m)'s . . . time limit for service [is inapplicable] where a party did not attempt service within the . . . limit and 'ha[d] not exactly bent over backward to effect service.'").

"When the foreign country exception does apply, the court use[s] a flexible due diligence standard to determine whether service of process was timely." *In re Bozel S.A.*, No. 16 Civ. 3739 (ALC), 2017 WL 3175606, at *2 (S.D.N.Y. July 25, 2017) (citation omitted). The plaintiff bears the burden of proving "that it exercised due diligence in not timely serving the defendant." *Id.*  In this analysis, "the court assesses the reasonableness of the plaintiff's efforts and the prejudice to the defendant from any delay." *Id.* (collecting cases).  However, if the foreign-country exception does not apply, "[u]nder Rule 4(m), the Court *must* extend the time to serve if plaintiff has shown good cause, and may extend the time to serve even in the absence of good cause." *DeLuca*, 695 F. Supp. 2d at 66 (citation omitted).  "In determining whether a plaintiff has shown good cause, courts weigh the plaintiff's reasonable efforts and diligence against the prejudice to the defendant resulting from the delay." *Id.* (citations omitted); *see Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 401–04 (S.D.N.Y. 2020) (discussing "good cause" standard).

2.      **Statutory Basis for Personal Jurisdiction**

a.      *New York Long-Arm Statute—CPLR § 302*

Astor asserts that this Court has specific personal jurisdiction over each defendant under CPLR § 302(a)(1), (2), and (3).

Under CPLR § 302(a)(1), two conditions must be met. First, the defendant must "transact . . . business within the state or contract[] anywhere to supply goods or services in the state." CPLR § 302(a)(1). Second, the cause of action must arise from the "act[s] which are the basis of jurisdiction." *Id.* This second condition requires a showing that the contacts with the state had a "substantial relationship" to the cause of action. *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006). Section 302(a)(1) is a "single act" statute; therefore, the defendant need not have engaged in more than one transaction in, or directed to, New York for New York courts to exercise jurisdiction. *See Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006). Jurisdiction under § 302(a)(1) exists even if "the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988); *see also Bank Brussels*, 171 F.3d at 787 (finding personal jurisdiction based on a single transaction where defendant was not physically present in state). A court may also find jurisdiction based on the totality of the defendant's conduct. *See, e.g.*, *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.").

Section 302(a)(2) provides an alternative basis for personal jurisdiction over a defendant who "in person or through an agent . . . commits a tortious act within the state." CPLR § 302(a)(2).

17

As with section 302(a)(1), "there is no minimum threshold of activity required so long as the cause of action arises out of the allegedly infringing activity *in New York*." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 567 (S.D.N.Y. 2000) (emphasis added).

Finally, section 302(a)(3) also permits courts to exercise personal jurisdiction over a non-domiciliary defendant "who in person or through an agent . . . commits a tortious act without the state causing injury to person or property within the state." CPLR § 302(a)(3).  Section 302(a)(3) applies only to a defendant that either "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state," or "(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." *Id.*

       b.     *Rule 4(k)(2)*

Rule 4(k)(2), the federal long-arm statute, allows federal courts to exercise personal jurisdiction if "(1) plaintiff's cause of action arise[s] under the federal law; (2) . . . the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) . . . the defendant's total contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending due process." *Hartford Fire Ins. Co. v. M/V MSC INSA*, No. 03 Civ. 2196 (SAS), 2003 WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (quoting *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*, 956 F. Supp. 427, 434 (S.D.N.Y. 1996)).  This rule "extends the reach of federal courts to impose jurisdiction over the person of all defendants against whom federal law claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the United States." *Chew v. Dietrich*, 143 F.3d 24, 27 (2d Cir. 1998) (quoting Federal Rule of Civil Procedure 4 Advisory Committee's note to 1993 amendment).

Rule 4(k)(2) thus "fill[s] a gap in the enforcement of federal law for courts to exercise personal jurisdiction over defendants with sufficient contacts with the United States generally, but insufficient contacts with any one state in particular." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 807 (S.D.N.Y. 2005) (citation omitted).  In this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.  *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019) (citing *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019) (summary order)); *see also Porina v. Marward Shipping Co., Ltd.*, No. 05 Civ. 5621 (RPP), 2006 WL 2465819, at *4 (S.D.N.Y. Aug. 24, 2006) (plaintiffs bear burden of certifying that to their knowledge, "the defendant is not subject to suit in the courts of general jurisdiction of any state" (quoting *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 41–42 (1st Cir. 1999))), *aff'd*, 521 F.3d 122 (2d Cir. 2008).

### 3.    Due Process Requirements for Personal Jurisdiction

Once a plaintiff establishes a statutory basis for jurisdiction, the plaintiff must "demonstrate that the exercise of jurisdiction comports with due process."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81–82 (2d Cir. 2018) (internal alterations omitted); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The constitutional analysis under the Due Process Clause consists of two separate components: the "minimum contacts" inquiry and the "reasonableness" inquiry.  *Licci*, 673 F.3d at 60 (citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010)).

The "minimum contacts" inquiry examines "whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction."  *Id.*  The Court considers these contacts in totality, with the crucial question being whether the defendant has

"purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" such that the defendant "should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King*, 471 U.S. at 474–75). Specific jurisdiction may also exist even if the relevant conduct took place outside the forum, based on the "in-state effects of out-of-state activity." *Best Van Lines*, 490 F.3d at 243. When the so-called "effects" test is invoked, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Licci*, 732 F.3d at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)). However, the mere "fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) (quoting *In re Terrorist Attacks*, 714 F.3d at 674).

The "reasonableness" inquiry examines "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Licci*, 673 F.3d at 60 (quoting *Int'l Shoe*, 326 U.S. at 216). As part of that inquiry, the Court considers:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Chloé*, 616 F.3d at 164–65 (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 113–14 (1987)).

III.    **Discussion**

A.    **The Food Depot Parties**

1.    **Statutory Personal Jurisdiction**

Jurisdiction is appropriate over the Food Depot Parties under CPLR § 302(a)(1).  That

section requires two showings: "(1) The defendant must have transacted business within the

state; and (2) the claim asserted must arise from that business activity." *Eades*, 799 F.3d at 168

(quoting *Licci*, 732 F.3d at 168).  As discussed, CPLR § 302(a)(1) is a "single act" statute.  *See*

*Deutsche Bank Sec.*, 7 N.Y.3d at 71.  Thus, "[c]ourts have held that shipping an infringing item

into New York to a New York customer is sufficient to satisfy C.P.L.R. § 302(a)(1)." *Verragio,*

*Ltd. v. S K Diamonds*, No. 16 Civ. 6931 (KBF), 2017 WL 1750451, at *4 (S.D.N.Y. May 4, 2017)

(collecting cases).

Here, jurisdictional discovery has shown that the Food Depot Parties have shipped and

sold several allegedly infringing products into New York State beyond those bought by Astor's

counsel.  *See* New York Sales Records.  Those sales constitute business transacted within the

state, and Astor's claims arise from precisely that conduct.  The sale and shipping of those

products into New York therefore provides a clear basis for personal jurisdiction under CPLR

§ 302(a)(1).  *See Carson Optical, Inc. v. RQ Innovasion Inc.*, No. 16 Civ. 1157 (SIL), 2020 WL

1516394, at *3 (E.D.N.Y. Mar. 30, 2020) ("When the internet sales at issue occur through third-

party websites such as Amazon, and the defendants merely post their items on that website and

then ship their goods to an Amazon fulfilment center before Amazon ultimately sends the goods

to consumers, jurisdiction is still proper.") (collecting cases); *Verragio*, 2017 WL 1750451,

at *4; *Deutsche Bank Sec.*, 7 N.Y.3d at 71.

The two cases the Food Depot Parties cite to resist this conclusion are inapposite.  In one,

the court relied on the fact that the only allegedly infringing sale had been initiated by the

plaintiff's investigator, finding that the plaintiff had therefore manufactured personal jurisdiction.

*See Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 935 F. Supp. 2d 615, 623

(S.D.N.Y. 2013) ("vast weight of authority" suggests that "a finding of personal jurisdiction may

not rest solely on an act such as this instigated by a plaintiff").  Here, however, discovery has

revealed that the Food Depot Parties made at least five other sales of the allegedly infringing

products into New York, none of which had been ordered by person or entity associated with

Astor.  In the other case, the court rejected personal jurisdiction because the "defendant is not

alleged to have shipped any trademark-infringing goods into New York."  *JGV Apparel Grp.,*

*LLC v. Therapy Stores, Inc.*, 2017 U.S. Dist. LEXIS 59139, at *10 (S.D.N.Y. Mar. 20, 2017).

That is not the case here.

Accordingly, the Court has jurisdiction over the Food Depot Parties under

CPLR § 302(a)(1).[8]

## 2.   Due Process

Exercising personal jurisdiction over the Food Depot Parties here would also comport

with constitutional due process.  As the Second Circuit has noted:

> It would be unusual, indeed, if a defendant transacted business in New York and
> the claim asserted arose from that business activity within the meaning of section
> 302(a)(1), and yet, in connection with the same transaction of business, the
> defendant cannot be found to have "purposefully availed itself of the privilege of
> doing business in the forum and [to have been able to] foresee being haled into
> court there."

---

[8] Because the Court may exercise personal jurisdiction over the Food Depot parties under CPLR
§ 302(a)(1), it does not have occasion to address plaintiffs' alternative arguments for jurisdiction
under CPLR § 302(a)(2) and (3).  Given the discovery showing their sales into New York, the
Food Depot Parties' only response regarding CPLR § 302 concerns what they term a lack of
"substantial revenue" derived from those sales.  *See* Def. Supp. Mem. at 8.  But as the Food
Depot Parties appear to acknowledge, that is relevant only to the inquiry under CPLR
§ 302(a)(3), not that under § 302(a)(1).

*Licci*, 732 F.3d at 170 (quoting *Bank Brussels*, 305 F.3d at 127) (court was unaware of cases that have found CPLR § 302(a)(1) satisfied and due process violated).  Even so, "[t]hat observation does not . . . spare us from a separate constitutional analysis in each such case."  *Id.*

Here, the Food Depot Parties marketed the infringing products to New York customers on Amazon.com and eFoodDepot.com.  And discovery has shown that they in fact sold, invoiced, and delivered such products into the state.  *See* New York Sales Records.  "This purposeful availment of the privilege doing business in New York with a New York resident is sufficient to establish minimum contacts under the Due Process Clause."  *Verragio*, 2017 WL 1750451, at *5.

Once minimum contacts are established, a defendant seeking to avoid personal jurisdiction "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King*, 471 U.S. at 477.  Here, the factors set forth in *Asahi* and *Chloé* do not present such a case.  First, although there is some burden associated with requiring the Food Depot Parties—based in California and incorporated in Oklahoma—to litigate this case in New York, that "inconvenience . . . cuts both ways."  *Chloé*, 616 F.3d at 173.  Were Astor forced to sue in either Oklahoma or California, its witnesses would have to travel there.  *Id.*  The second and third factors favor Astor, "as New York has an interest in preventing the intellectual property of its citizens from being infringed," and Astor is a New York corporation.  *Pearson Educ., Inc. v. Textbook Discounters*, No. 10 Civ. 324 (WHP), 2010 WL 3528866, at *2 (S.D.N.Y. Aug. 20, 2010); *see Amorphous v. Morais*, No. 17 Civ. 631 (NRB), 2018 WL 1665233, at *7 (S.D.N.Y. Mar. 15, 2018) ("New York has an interest in adjudicating cases of copyright and trademark infringement allegedly perpetrated against those who live and work in the state."); *Verragio*, 2017 WL 1750451, at *6 ("New York has a

significant interest in protecting copyright holders from the sale of infringing goods in New York." (quoting *Ed. Music Latino Americana, S.A. v. Mar Int'l Recs., Inc.*, 829 F. Supp. 62, 66 (S.D.N.Y. 1993))).  The fourth and fifth factors are essentially neutral; no party identifies compelling arguments in either direction as to them.  The Court thus finds exercising personal jurisdiction over the Food Depot Parties consistent with the Due Process Clause.

### B.   Mayora Indah[9]

#### 1.   Service of Process

As noted, the parties previously disputed whether Astor's service of process upon a person in California named Yuki Teng, who appears to have represented himself to be affiliated with Mayora Indah, sufficed to effect service on Mayora Indah.  *See Astor I*, 2020 WL 2130680, at *11.  Mayora Indah maintained (and maintains) that, despite certain indications that Teng may have been its employee, he has never been a Mayora employee and could not accept service on Mayora Indah's behalf.  *See* Mayora Mem. at 5–8; Def. Supp. Mem. at 13–14.

Discovery on this issue has shed little light on the parties' dispute.  Mayora Indah has steadfastly maintained that "Yuki Teng is not an employee of Mayora and has never been an employee of Mayora."  Mayora Interrogatories at 6.  Rather, it states that he is the principal of another company, Yulen, Inc., which Mayora Indah retained "to conduct marketing."  *Id.*  It explains that "Yuki Teng was assigned the 'yuki.tenggara@mayora.co.id' email address in connection with Yulen, Inc.'s, contract with Mayora."  *Id.*  But it fails to explain why Mr. Teng identified himself on his own LinkedIn as "Sales and Promotion Manager" at Mayora Indah, and

---

[9] In its prior decision, the Court noted that Mayora Group and Mayora Co, originally named as defendants, appeared not to be legal entities.  *See Astor I*, 2020 WL 2130680, at *10 n.7.  Accordingly, absent "revelation" to the contrary through discovery, the Court expected to dismiss those parties after jurisdictional discovery.  Because no party has come forth which such revelatory information, the Court dismisses those parties and discusses only Mayora Indah, or "Mayora."

states only that it must have been a "mistake" for Elite Gold to have listed him as country manager for the "Mayora Group" in its Initial Disclosures to the USPTO.  Gunawan Tr. at 18–19.  Rather, Mayora's Rule 30(b)(6) witness suggested, it might have been more appropriate to have called him a "development manager," although he did not explain what implications that would have had for Teng's role and relationship with Mayora Indah.  *Id.* at 19–20.  Even after discovery, therefore, the record is far from clear about whether Astor's service on Teng sufficed to serve Mayora Indah.

The Court, however, need not resolve this dispute.  Since the Court's initial decision, Astor has effected service on Mayora Indah directly, and filed proof of such service.  *See* Pl. Supp. Mem. at 14–15; Dkt. 91.  Mayora Indah has not objected to this form of service or otherwise argued that it is invalid.  *See* Def. Supp. Mem.  As noted, Rule 4(m)'s usual 90-day limit for effecting service does not apply so long as "the plaintiff . . . attempt[ed] to serve the defendant [that resides] in the foreign country" within 90 days.  *USHA*, 421 F.3d at 133–34; *see* Fed. R. Civ. P. 4(m).  If the plaintiff attempted to do so, "the court use[s] a flexible due diligence standard to determine whether service of process was timely."  *In re Bozel*, 2017 WL 3175606, at *2 (citation omitted).

Astor attempted to serve Mayora Indah within 90 days of filing the first amended complaint, the first pleading to name Mayora Indah as a party.  That complaint was filed on September 23, 2019.  Dkt. 29.  On November 16, 2019, Astor filed an affidavit of service attesting that service had been made on Mayora Indah by delivering the summons and complaint to "Yuki Teng – Agent for Service of Process Authorized to Accept" on October 23, 2019.  Dkt. 59.  Although Mayora Indah contests the effectiveness of that service, it qualifies as an attempt to serve process.

Next, the Court must assess Astor's diligence and efforts in attempting to serve Mayora Indah. "Under this standard, the court assesses the reasonableness of the plaintiff's efforts and the prejudice to the defendant from any delay." *In re Bozel*, 2017 WL 3175606, at *2. Astor's efforts have been reasonable. First, as discussed above and in *Astor I*, Astor had good reason to believe that Teng, given the indicia of his affiliation with Mayora scattered throughout this case and in the public record, was authorized to accept service on Mayora Indah's behalf. He had been identified as the country manager for "Mayora Group," held himself out as an employee of Mayora on LinkedIn, and had a Mayora company email address. In such circumstances, it was not unreasonable for Astor to believe it could serve Mayora Indah through Teng. Second, after Mayora Indah moved to dismiss and the Court directed Astor to "begin the process of effecting service on Mayora Indah," Astor did so promptly. *Astor I*, 2020 WL 2130680, at *12. On May 18, 2020, less than two weeks after the Court's decision, Astor served a member of Mayora Indah's "Legal Department" in Jakarta, Indonesia, and on July 15, 2020, it filed an affidavit of service attesting to that service. Dkt. 91.

Nor has any delay in effecting service caused prejudice to Mayora Indah. As the Court has noted, any such prejudice is likely "minimal," as Mayora Indah is "already actively litigating personal jurisdiction and . . . appear[s] to have first raised the issue of service in connection with this motion." *Astor I*, 2020 WL 2130680, at *12. In its supplemental memorandum, Mayora Indah does not contradict that conclusion or offer any additional facts that would support a finding of prejudice here. Accordingly, the Court holds that, whether or not Teng was authorized to accept service on Mayora Indah's behalf, service has now timely been effected on Mayora Indah.

2.      **Personal Jurisdiction**

a.      *New York Long-Arm Jurisdiction*

Astor argues that personal jurisdiction is appropriate over Mayora Indah under all three subsections of CPLR § 302(a).  The Court addresses each in turn.

*CPLR § 302(a)(1):*  Under CPLR 302(a)(1), as noted, "(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."  *Eades*, 799 F.3d at 168 (quoting *Licci*, 799 F.3d at 168).  Astor does not identify any sales that Mayora Indah made into New York.  *See* Lauwrus Decl. ¶ 5 (Mayora "does not sell any products in the U.S. or on Amazon.  It sells to distributors outside of the U.S.").  Rather, Mayora Indah sold the allegedly infringing products to Takari, which sold those products to the Food Depot Parties, which sold those products to persons in New York.  None of the cases cited by Astor finding section 302(a)(1) applicable involved such an indirect chain of events leading to a sale in New York.  Rather, for the most part, these involved sales by defendants directly into New York.  *See E. Mishan & Sons, Inc. v. Smart & Eazy Corp.*, No. 18 Civ. 3217 (PAE), 2018 WL 6528496, at *5 (S.D.N.Y. Dec. 12, 2018) (defendant sold several products through third-party website into New York); *GTFM, Inc. v. Fubutu Home & Educ. Media, Inc.*, No. 01 Civ. 6595 (VM), 2003 WL 22439791, at *3 (S.D.N.Y. Oct. 27, 2003) (decided under CPLR § 302(a)(2), defendant sent sales materials directly to New York customers); *Bus. Trends Analysts v. Freedonia Grp., Inc.*, 650 F. Supp. 1452, 1456 n.8 (S.D.N.Y. 1987) (defendant "has shipped a copy of its robotics study to a customer in New York"); *Deutsche Bank Sec.*, 7 N.Y.3d at 71–72 (defendant transacted "knowingly" and directly with New York bank employee, "pursuing a negotiation with a [Deutsche Bank] employee in New York that culminated in" the sale of $15 million in bonds); *cf. Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999) (where defendant was a foreign company that sold the offending product to an exclusive distributor in

Pennsylvania, which then sold the product into New York, "[t]he parties agree[d] that the only possible basis for jurisdiction over [defendant] under New York's long-arm statute is § 302(a)(3)(ii)").

Astor also suggests in passing that Takari or the Food Depot Parties may be considered Mayora Indah's "agents" for purposes of CPLR § 302(a)(1).  Although Astor "need not establish a formal agency relationship" between Mayora Indah and a party that ultimately sold products into New York in order to satisfy the requirements in CPLR 302(a)(1), it still needs to show that such a party acted "for the benefit of and with the knowledge and consent of [Mayora Indah] and that [Mayora Indah] exercised some control over" such a party in the matter.  *Kreutter*, 71 N.Y.2d at 467.  Astor has not established this.  Rather, both Takari and the Food Depot parties appear to be independent distributors and retailers.  Mayora Indah has denied possessing any control over even Takari's sales efforts.  *See* Gunawan Tr. at 29–30.  Nothing in Astor's allegations or proof suggests that Mayora Indah had control of Takari or the Food Depot Parties, or that their sales can otherwise be directly attributed to Mayora Indah.  And the cases it cites are far removed from the circumstances here.  *Cf. Bus. Trends Analysts*, 650 F. Supp. at 1455–56 (defendant hired New York-based company specifically to solicit New York sales, made sales into New York, and paid New York company commission based on those sales).  Accordingly, CPLR § 302(a)(1) does not support the Court's exercise of personal jurisdiction.

*CPLR § 302(a)(2):*  The same is true of CPLR § 302(a)(2).  Under longstanding New York precedent, recognized and adopted by the Second Circuit, CPLR § 302(a)(2) applies exclusively when a defendant was *physically present* in the state of New York when it committed a tortious act.  *See, e.g.*, *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) (quoting official practice commentary to CPLR § 302 explaining that "if a New Jersey

domiciliary were to lob a bazooka shell across the Hudson River at Grant's tomb, *Feathers* would appear to bar the New York courts from asserting personal jurisdiction over the New Jersey domiciliary in an action by an injured New York plaintiff.").  That precedent forecloses Astor's argument under § 302(a)(2).  The only cases Astor cites in opposition were either decided under CPLR § 302(a)(1), and involved actual sales of infringing products by the relevant defendant into New York, or involved defendants physically present in the state.  *See Pearson Educ., Inc. v. Shi*, 525 F. Supp. 2d 551, 555–57 (S.D.N.Y. 2007) (finding personal jurisdiction under CPLR § 302(a)(1)); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 725 F. Supp. 1314, 1318 (S.D.N.Y. 1989) (defendant's president traveled to New York four times and "sold his corporation's product to a variety of retailers from both the Southern District and outside"); *Bus. Trends Analysts*, 650 F. Supp. at 1456 (basing personal jurisdiction on defendant's "sale of the robotics study to a New York customer and its solicitation of sales in New York by direct mail").  As explained, no such sales occurred here.[10]

*CPLR § 302(a)(3):*  Finally, Mayora Indah is not subject to personal jurisdiction under CPLR § 302(a)(3).  That provision permits personal jurisdiction when a defendant commits a tort outside New York which causes harm within New York, *and* one of two other circumstances are present: the defendant (1) "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services

---

[10] Nor does the fact that Mayora Indah's website may have displayed the infringing products to New York residents establish jurisdiction over Mayora.  Where a website is passive (as was Mayora's), "the tort is deemed to be committed where the web site is created and/or maintained." *Citigroup*, 97 F. Supp. 2d at 567 (collecting cases).  Here, Astor has not alleged or shown that the Mayora website was created in New York or that it is maintained on New York servers. "Thus, the mere display of the [Astor] marks on th[is] website[] cannot be deemed a tort committed within this State."  *Id.*

rendered, in the state"; or (2) "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  CPLR § 302(a)(3)(i), (ii).

Astor does not make a serious argument that the first prong applies here.  It has not produced any evidence that Mayora Indah regularly does business in New York, derives substantial revenue from sales into New York, or has otherwise engaged in a "persistent course of conduct" within New York.  Even after jurisdictional discovery, there is no evidence regarding what portion of Mayora Indah's income or revenue originates in the state, even indirectly through retailers like the Food Depot Parties.  *Cf. DH Servs., LLC v. Positive Impact, Inc.*, No. 12 Civ. 6153 (RA), 2014 WL 496875, at *12 (S.D.N.Y. Feb. 5, 2014) (no jurisdiction under CPLR § 302(a)(3)(ii) where defendant derived 2% of all funding directly from New York-based parties).  And, as discussed, Astor has not identified any actions taken by Mayora Indah targeted specifically at New York, even ones unrelated to the allegedly unlawful conduct.  *Cf. id.* at *12 (advertisement of infringing goods on website viewable within New York insufficient to support jurisdiction under CPLR § 302(a)(3)(i)).  CPLR § 302(a)(3)(i) thus does not apply here.

The question is closer under section 302(a)(3)'s second prong.  The New York Court of Appeals has explained that jurisdiction under that provision requires Astor to demonstrate the following five factors:

> First, that defendant committed a tortious act outside the State; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.

*LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000).

Most of these factors appears to be undisputedly present.  Astor alleges that Mayora Indah's trademark infringement occurs outside New York, either through its marketing on its

website or its affixing of the allegedly infringing mark on products in Indonesia.  Its cause of

action arises from that alleged infringement.  And Astor alleges that the infringement has caused

harm within New York, as the infringing products ultimately were sold to New York consumers.

Further, it appears indisputable that Mayora Indah, which boasts of distributing its products in

over 90 countries, derives "substantial revenue from . . . international commerce." *LaMarca*,

95 N.Y.2d at 214; *see, e.g.*, Lane Aff., Ex. A.; Second Shalyutin Decl., Ex. E-2 at ECF p. 21

(showing Mayora Indah's 2016–2018 financials).

The relevant question, therefore, is whether Mayora "expected or should reasonably have

expected the act to have consequences in" New York.  *LaMarca*, 95 N.Y.2d at 214.  This test is

"objective rather than subjective."  *Kernan*, 175 F.3d at 241 (quoting *Allen v. Auto Specialties*

*Mfg. Co.*, 45 A.D.2d 331, 357 (3d Dep't 1974)).  "New York courts have sought to avoid conflict

with federal constitutional due process limits on state court jurisdiction by applying the

'reasonable expectation' requirement in a manner consistent with United States Supreme Court

precedent."  *Id.*  Thus, "the simple likelihood or foreseeability that a defendant's product will

find its way into New York does not satisfy this element, and . . . purposeful availment of the

benefits of the laws of New York such that the defendant may reasonably anticipate being haled

into New York is required."  *Id.* (citation omitted) (collecting cases).  This means that the

defendant "must have made a discernible effort to directly or indirectly serve the New York

market."  *RegenLab USA LLC v. Estar Techs. Ltd.*, 335 F. Supp. 3d 526, 540 (S.D.N.Y. 2018)

(citation omitted).  "[O]ccasional sales into New York, or awareness of a possibility that a

product will find its way into New York, is not sufficient to satisfy this element."  *Boyce v. Cycle*

*Spectrum, Inc.*, 148 F. Supp. 3d 256, 266 (E.D.N.Y. 2015) (quoting N.Y. Civ. Prac. ¶ 302.14).

On this element, Astor emphasizes that when Mayora Indah sold its products to Takari for distribution into the United States, it did not restrict Takari from re-selling those products into New York, and that it should therefore have reasonably expected such products, ultimately, to arrive in New York. *See* Pl. Supp. Mem. at 16–17; Second Pl. Mem. at 18–21.  In support, it relies mainly on the Second Circuit's decision in *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d at 242.[11]  There, the defendant was a Japanese manufacturer whose product had caused injury to the plaintiff in New York. *Id.* at 238.  The defendant had not sold the product directly into New York, but had sold it to a Pennsylvania distributor, which in turn sold the product to the plaintiff's New York employer. *Id.* at 239.

Several considerations that led the Second Circuit to approve of the exercise of personal jurisdiction in that "admittedly . . . close" case are, however, lacking here. *Id.* at 242.  First, the Court in *Kernan* relied heavily on the fact that the manufacturer and its Pennsylvania distributor had entered into an "exclusive sales rights" agreement, which granted the Pennsylvania company exclusive rights to sell the manufacturer's products in the United States. *Id.* at 242.  This feature of the parties' relationship appears to have distinguished it from an earlier New York case that held "that the sole fact that the company had sold its products to a Massachusetts company, which then sold the machines throughout the United States, was insufficient to satisfy § 302(a)(3)(ii)'s 'reasonable expectation' requirement." *Id.* (contrasting *Schaadt v. T.W. Kutter*, 169 A.D.2d 969 (1991), with later case involving exclusive distributorship agreement and

---

[11] Astor also cites *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 472 (S.D.N.Y. 2008).  But that case is far afield.  There, the defendant had "sold [its infringing product] *directly to New Yorkers* over an active commercial website on at least a dozen occasions," *id.* at 469 (emphasis added), "filled orders with delivery addresses in New York," *id.* at 471, and advertised events scheduled to occur in New York, *id.* at 472.  Here, Astor has not identified any evidence that Mayora Indah's activities approached this level of proximity to New York.

distributor making repairs in New York); *see Lombardi v. Staples, Inc.*, No. 15 Civ. 6158 (SJF), 2016 WL 11509961, at *5 (E.D.N.Y. Dec. 15, 2016) (contrasting cases involving such agreements, where CPLR § 302(a)(ii) was satisfied, with cases lacking such agreements, where it was not). Here, there is no evidence of such an arrangement; Mayora Indah simply sold its products to Takari, a Canadian entity, with no agreement in place between the two entities as to how, where, or whether Takari would re-sell them. *See* Gunawan Tr. at 29–30. Second, in *Kernan*, the agreement between the Japanese corporation and its Pennsylvania distributor expressly provided for "the exchange of information relevant to product development, as well as pricing information." *Kernan*, 175 F.3d at 242. Here, in contrast, Mayora Indah did not receive any reports at all from Takari on any subject whatsoever, including as to if or where its products were re-sold. *See* Gunawan Tr. at 29. Third, the distribution chain is more attenuated here than in *Kernan*. There, the foreign corporation sold its product to a U.S. distributor, which then shipped it directly to New York. Here, Mayora Indah sells to Takari (a Canadian corporation), which then sells to retailers in the United States (but, on the record presented, not in New York), which *then* sell at least some products into New York.

This case therefore involves a much more tenuous connection to New York than did *Kernan*. Mayora Indah "does not have *any* agreements with New York-based distributors or exclusive agreements with any U.S.-based distributors, and generally sells its products free-on-board out of factories and ports in [Indonesia] to customers who take possession of the products and then resell them in the United States and elsewhere without any further involvement by" Mayora Indah. *Lombardi*, 2016 WL 11509961, at *5; *see Boyce*, 148 F. Supp. 3d at 261–62 (no personal jurisdiction under CPLR § 302(a)(3)(ii) where Chinese manufacturer-defendant sold products to Taiwanese company, which sold to importer, which sold to retailer, which sold to

plaintiff in New York); Gunawan Tr. at 34–35.  Nor, as discussed, did Mayora Indah "advertise or sell its products directly in New York."  *Lombardi*, 2016 WL 11509961, at *5.  As a result, the record permits the Court to conclude only that Mayora Indah has an "awareness of a possibility that [its] product will find its way into New York," which does not satisfy CPLR § 302(a)(3)(ii).  *Boyce*, 148 F. Supp. 3d at 266; *see Lombardi*, 2016 WL 11509961, at *5 ("The bottom line is that a court cannot assert § 302(a)(3)(ii) jurisdiction over a foreign manufacturer based upon allegations suggesting only that it manufactured a product overseas and generally understood that, by sheer dint of population distribution and economic gravity, some of those products may eventually be sold in New York through distribution channels that the foreign manufacturer was not privy to and exercised no control over.").  Accordingly, jurisdiction over Mayora Indah is not permissible under New York's long-arm statute.[12]

---

[12] Because the Court finds personal jurisdiction lacking under New York's long-arm statute, it does not have occasion to consider whether exercising jurisdiction over Mayora Indah would also violate the Due Process Clause.  But *Kernan*'s further holding that jurisdiction was permissible under the U.S. Constitution has since been called into question by the decision in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011).  There, the Supreme Court—albeit through two fractured, non-majority opinions—held that, in a situation like the one in *Kernan*, the Due Process Clause precluded the exercise of personal jurisdiction over a foreign defendant. *Id.* at 878, 885–87 (no personal jurisdiction in New Jersey over foreign company that sold products into New Jersey solely through U.S.-based distributor); *id.* at 911 (Ginsburg, J., dissenting) (identifying *Kernan* as being undermined by the Court's decision).  Thus, "[o]f the courts in this Circuit that have considered *Kernan*-like situations post-*J. McIntyre*, only one has found that the exercise of personal jurisdiction over the foreign defendant would not offend due process."  *State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 880, 891, 892 (S.D.N.Y. 2017) (collecting cases but finding personal jurisdiction constitutional given that defendant "targeted" New York).  In the one other case finding such jurisdiction constitutional, the foreign manufacturer's agreement with its distributor required it to approve every order it received from that distributor, leading the district court to conclude that the manufacturer had "presumptive knowledge" over the "hundreds of thousands" of relevant products sold into New York.  *UTC Fire & Sec. Americas Corp. v. NCS Power, Inc.*, 844 F. Supp. 366, 369 (S.D.N.Y. 2012).  Accordingly, even were the Court to find that the New York long-arm statute applied here, it is doubtful that, on the current record, jurisdiction would be permissible in New York under the Due Process Clause.

b.      *Federal Long-Arm Jurisdiction*

Astor also argues, in the alternative, that jurisdiction over Mayora Indah is appropriate under the federal long-arm provision.  *See* Fed. R. Civ. P. 4(k)(2).  Under that rule, the Court may exercise personal jurisdiction over a defendant where (1) a plaintiff's cause of action arises under federal law; (2) the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) the defendant's total contacts with the United States as a whole are sufficient to satisfy the Due Process Clause.  *Hartford Fire*, 2003 WL 22990090, at *3.  As to the second requirement, Astor bears the burden of certifying that, to its knowledge, Mayora Indah is not subject to jurisdiction in any state's courts.  *In re SSA Bonds*, 420 F. Supp. 3d at 240 ("Because the Plaintiffs in the instant case have not certified that the Foreign Dealer Defendants are not subject to general jurisdiction in another state, they have not met all of the elements of Rule 4(k)(2)."); *see 7 W. 57th St. Realty*, 2015 WL 1514539, at *13 (declining to apply Rule 4(k)(2) where plaintiff had not made such certification); *In re M/V MSC FLAMINIA*, 107 F. Supp. 3d 313, 322–23 (S.D.N.Y. 2015) (same).[13]

Even assuming that Astor has satisfied the first and third requirements of Rule 4(k)(2), it has failed to meet the second.  Neither its original opposition to Mayora Indah's motion to dismiss nor its post-discovery supplemental memorandum make such a certification.  In fact, the latter does not discuss Rule 4(k)(2)'s application to Mayora Indah at all.  *See* Second Pl. Mem.

---

[13] Mayora Indah has argued that Astor may not contend both that New York State courts have jurisdiction over Mayora Indah *and* that Mayora Indah is not subject to the jurisdiction of any state's courts, given this certification requirement.  *See* Def. Supp. Mem. at 5.  There appears to be a split in authority whether arguing in the alternative in this way is permissible under Rule 4(k)(2).  *See Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1294–95 (Fed. Cir. 2009) (collecting circuit courts' approaches).  Courts in this Circuit appear not to have squarely addressed the question.  Given the holding, *infra*, that Astor has not satisfied Rule 4(k)(2)'s requirements even assuming it may simultaneously argue for personal jurisdiction under both CPLR § 302 and Rule 4(k)(2), the Court has no occasion to address this question.

at 22 (noting that "the remaining prongs of Rule 4(k)(2) are also satisfied" without making such certification); Pl. Supp. Mem. at 15–17; *cf.* First Pl. Mem. at 13–14 (making such certification as to Elite Gold).

Indeed, such a certification may be impossible. Mayora Indah has admitted to contracting with a California corporation—Yulen, Inc., run by Yuki Teng—to market and promote its products within the United States. *See* Mayora Interrogatories at 6; Second Shalyutin Decl., Ex. E-1, Ex. 2 (California articles of incorporation for Yulen); Gunawan Tr. at 13 ("Q. So Mr. Teng helps Takari in marketing Mayora's products in the U.S.? A. Yeah. This is why we have contract with Yulen company."). It has also identified Yuki Teng, who resides in California, as Mayora Indah's "contact point for the US" for Mayora's U.S. distribution through Takari. Mayora Interrogatories at 5; *see* Lane Aff., Ex. A (Teng's Mayora email address associated with Mayora Indah's U.S. distribution); First Shalyutin Decl., Ex. H (Teng LinkedIn). And as Astor notes, Mayora Indah's sales records to Takari suggest that at least some such sales go to or through California. *See* Third Shalyutin Decl., Ex. E-1, Ex. 1 at ECF p. 12 (invoice from Mayora Indah to Takari showing shipping destination for "Astor Wafer Chocolate" in "Los Angeles, USA"); *id.* at ECF p. 14 (same, but showing "place of delivery" in Los Angeles, CA and "final destination" in Ontario, Canada). California's long-arm statute extends its courts' reach to the full extent of the Constitution's limits. *See* Cal. Code Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."). Thus, it seems unlikely that Astor could have shown, had it attempted to do so, that Mayora Indah is not subject to the jurisdiction of any state's courts.

Accordingly, the Court cannot exercise personal jurisdiction over Mayora Indah under Rule 4(k)(2).

### C.    Elite Gold

Last, the Court addresses Elite Gold's motion to dismiss Astor's claims against it.  For reasons similar to those above, the Court grants that motion because there is no statutory basis for exercising personal jurisdiction over Elite Gold.

#### 1.    New York Long-Arm Jurisdiction

As with Mayora Indah, Astor argues that all three subsections of CPLR § 302(a) establish the Court's jurisdiction over Elite Gold.  If anything, however, Elite Gold's connections to New York are more tenuous than Mayora Indah's.

For the most part, Astor's arguments as to Elite Gold seek to establish that Mayora Indah's sales of products bearing the Elite Gold Mark are attributable to Elite Gold.  *See* First Pl. Mem. at 5–10; Pl. Supp. Mem. at 7–8 (arguing that the $1 payment in the license agreement suggests that Elite Gold benefits in some other way from the license); *id.* at 8–9 (citing overlap in directors between Mayora Indah and Elite Gold).  But even assuming that to be so, Mayora Indah's actions—which fail to support New York long-arm jurisdiction over Mayora Indah—*a fortiori* do not support such jurisdiction over Elite Gold.  Elite Gold merely licenses the allegedly infringing Elite Gold Mark to Mayora Indah, but it does not itself manufacture, sell, distribute, market, or promote products bearing that mark, let alone do so in a manner directed toward New York.  *See* Tjay Decl. ¶¶ 11, 16–17.  In other words, Elite Gold is yet another step removed from New York, as it has merely authorized, through a license agreement, some of the Mayora Indah activities that, as discussed above, do not support the exercise of jurisdiction over Mayor Indah.[14]

---

[14] Astor also seeks to attribute to Elite Gold the Food Depot Parties' sales into New York, citing Elite Gold's representation in a discovery response that the Food Depot Parties' sales provide evidence of the Elite Gold Mark's "use in commerce."  *See* Pl. Supp. Mem. at 9 (citing First Shalyutin Decl., Ex. C ("Elite Gold RFP Response") at 6).  Astor, however, does not cite any authority for premising personal jurisdiction on such a response, or on downstream re-sales of an allegedly infringing product by parties who bought the product from a licensee.

Accordingly, Astor has not established any basis for exercising jurisdiction over Elite Gold under CPLR § 302(a).  Elite Gold has not transacted business within New York or committed a tort here.  CPLR § 302(a)(1), (2); *see Eades*, 799 F.3d at 168; *Bensusan*, 126 F.3d at 28.  Nor does the fact that it licensed the Elite Gold Mark to Mayora Indah establish an objective expectation that its acts would have consequences in New York specifically.  *See Kernan*, 175 F.3d at 241.  Astor cites no authority that a licensor of an infringing mark may be subject to personal jurisdiction in any given state solely through its licensee's actions directed toward the forum state—let alone that a licensor may be subject to such jurisdiction where the licensee itself is not.  CPLR § 302(a) therefore does not provide a basis for exercising personal jurisdiction over Elite Gold.

### 2.        Federal Long-Arm Jurisdiction

Nor is jurisdiction over Elite Gold permissible under Rule 4(k)(2).  That is because, even if the first and second elements—*i.e.*, that Astor's claim arises under federal law and Elite Gold is not subject to any state's court's jurisdiction—are met, Astor has not shown that the Elite Gold's total contacts with the United States satisfy the Due Process Clause.  *See Hartford Fire*, 2003 WL 22990090, at *3.  Astor's main argument on this point is that Elite Gold's registration of the Elite Gold Mark with the USPTO represents a purposeful availment of the laws of the United States.  *See* First Pl. Mem. at 14–15; Pl. Supp. Mem. at 11.  It also contends that Elite Gold's unrestricted license to Mayora Indah "allowing Mayora to distribute infringing products into the" United States supports exercising personal jurisdiction over it.  Pl. Supp. Mem. at 11–12.

As to the first point, the weight of authority rejects basing federal long-arm jurisdiction on the mere registration of a U.S. trademark.  *See, e.g., Allergan, Inc. v. Dermavita Ltd. P'ship, Dima Corp. S.A.*, No. 17 Civ 619 (CJC), 2018 WL 1406913, at *4 (C.D. Cal. Jan. 3, 2018) ("Dermavita's filing of trademark applications and petitions to cancel Allergan's trademarks are

also insufficient" under Rule 4(k)(2)); *Fumoto Giken Co. v. Mistuoka*, No. 14 Civ. 9797 (DMG),

2015 WL 12766167, at *5 (C.D. Cal. Apr. 16, 2015) ("[T]his Court is not persuaded that the

mere registration of a trademark with the PTO, without more, amounts to the type of minimum

contacts which would justify haling a foreign defendant into federal court."); *Schulman v. Glob.

Citizens Travel, LLC*, No. 13 Civ. 23766 (KMW), 2015 WL 11018438, at *6 (S.D. Fla.

Jan. 20, 2015) (rejecting "the proposition that, by registering a trademark in the United States, a

foreign corporation has submitted itself to the general jurisdiction of any federal court in the

United States for any claim of any kind"); *Ramteq Inc. v. Alfred Karcher, Inc.*, No. 05 Civ. 3224,

2006 WL 8451178, at *5 (S.D. Tex. Sept. 18, 2006) ("Karcher's registration of patents and

trademarks does not give rise to Rule 4(k)(2) jurisdiction.").

       As to the second, the Court is similarly unpersuaded, absent any authority cited to the

contrary, that a trademark licensing agreement between foreign parties subjects the licensor to

jurisdiction in any U.S. district court solely because the agreement does not forbid a licensee

from selling products into the United States.

       Accordingly, there is no statutory basis for personal jurisdiction over Elite Gold in this

Court.[15]

### D.    Further Jurisdictional Discovery

       Finally, the Court addresses Astor's complaints about the adequacy of the defendants'

discovery responses. *See* Pl. Supp. Mem. at 2–3. In its post-discovery supplemental

memorandum, Astor for the first time has notified the Court of its view that defendants "fail[ed]

to fully adhere to this Court's Jurisdictional Discovery Order." *Id.* at 2. Accordingly, in the

event that the Court found personal jurisdiction lacking, Astor asked the Court to "direct the

---

[15] As above, the lack of long-arm jurisdiction over Elite Gold obviates any occasion to assess the additional constraints imposed by the Due Process Clause.

defendants to amend their incomplete responses and productions, and provide additional information fully responsive to plaintiff's discovery" requests. *Id.* at 3.

To be sure, some of the defendants' discovery responses appear to have been evasive, even if not in direct contravention of the Court's prior order. But it is too late for Astor to raise this issue. If Astor was dissatisfied with the responses it received from the defendants, it should have sought a motion to compel from this Court during the discovery period. *See, e.g.*, *Tanner v. Heath Graphics LLC*, No. 15 Civ. 98 (LEK), 2017 WL 922013, at *8 (N.D.N.Y. Mar. 8, 2017) (denying additional jurisdictional discovery where parties had not "explained why a motion to compel could not have been filed before discovery closed"). Instead, it chose to move forward with the responses it received, contending that it is "nonetheless clear that jurisdiction over all defendants in this Court is proper," Pl. Supp. Mem. at 2, and seeking the Court's intervention in only as a hedge against the possibility that it had miscalculated. Astor cannot have it both ways. The Court declines to permit this jurisdictional discovery to stretch on, and will not order additional jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, the Court denies the Food Depot Parties' motion to dismiss but grants the motions to dismiss filed by the Mayora Parties and Elite Gold.

The Clerk of Court is respectfully directed to terminate PT Mayora Indah TBK, Mayora Group, Mayora Co., and Elite Gold Ltd. from this case.

The Clerk of Court is also respectfully directed to terminate the motions pending at dockets 19, 45, 61, and 64.

The Food Depot Parties shall file their answer by January 4, 2021.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: December 21, 2020
       New York, New York